**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DISH NETWORK, LLC,

      Petitioner - Cross/Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

      Respondent - Cross/Petitioner.

Nos. 16-9514 and 16-9526
(NLRB No. 27-CA-131084)
(Petition for Review)

**ORDER AND JUDGMENT**[*]

Before **HOLMES**, **MATHESON**, and **McHUGH**, Circuit Judges.

**INTRODUCTION**

    David Rabb worked as an inside sales associate ("ISA") at a Dish Network, LLC ("Dish") call center in Littleton, Colorado. Mr. Rabb took incoming calls from potential customers and tried to sell them Dish's services. Dish in turn incentivized sales by offering commissions. Dish, however, also discouraged undesired conduct by docking commissions. These reductions in pay upset Mr.

---

    [*]    This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Rabb. He complained about these practices to management and coworkers. He eventually complained to the State of Colorado, filing a complaint with the Colorado Department of Labor ("CDOL").

The CDOL, however, had no statutory authority on which to act. Mr. Rabb subsequently retained an attorney regarding the matter. In early 2014, Mr. Rabb began soliciting coworkers at Dish to join a potential lawsuit against Dish. Then, in mid-February 2014, Dish disciplined Mr. Rabb, allegedly for this solicitation activity. The call center manager, Emily Evans, twice sought to have Mr. Rabb fired for it. She was unsuccessful. But less than a month later, he was fired for using silent hold (putting a customer on hold without music being played) to go to the bathroom. Mr. Rabb then complained to the National Labor Relations Board (the "Board" or "NLRB").

Before an administrative law judge ("ALJ"), Mr. Rabb testified that he had long used silent hold to go to the bathroom, that his supervisors knew of the practice, and that the practice was not uncommon among ISAs. The ALJ credited Mr. Rabb's testimony, and found incredible the testimony of both the call center manager, Ms. Evans, and David Gass, an inside sales manager. More specifically, the ALJ found that—motivated by Mr. Rabb's solicitation of coworkers for his lawsuit—Ms. Evans and Mr. Gass had put Mr. Rabb under scrutiny with the intention of finding a reason for which to fire him and, consequently, identified as termination grounds Mr. Rabb's long-standing practice of using silent hold to go

2

to the bathroom. Consequently, the ALJ found that Dish had violated the National Labor Relations Act ("Act" or "NLRA"), *see* 29 U.S.C. §§ 157, 158(a)(1), by firing Mr. Rabb while motivated in part by animus towards Mr. Rabb's solicitation of coworkers to join a lawsuit over Dish's pay practices. Additionally, the ALJ found that Dish had an unlawfully overbroad nonsolicitation policy and had violated the NLRA by disciplining Mr. Rabb under that policy. Dish appealed to the full Board. The Board affirmed. Dish now petitions this court for review. The Board cross-petitions for enforcement.

Exercising jurisdiction pursuant to 29 U.S.C. § 160(e)–(f), we deny Dish's petition for review and enforce the Board's order against Dish.

## I. BACKGROUND

Dish maintains a call center in Littleton, Colorado, where ISAs take incoming phone calls from potential customers and attempt to sell them Dish's various offerings. ISAs earn a base salary and commissions. The call center has a manager, Ms. Evans, and two inside sales managers, of whom only one, Mr. Gass, is involved in this case. Below the sales managers are "coaches" who supervise fifteen-member teams of ISAs. Mr. Rabb's coach at the time of his firing was Barry Appelhans.

When ISAs begin their shifts, they log into their computers and then transfer into "READY AUX," which permits calls to be directed to them. ISAs can forestall incoming calls while receiving supervision by using the

3

"COACHING AUX" feature. While on calls, which usually last between fifteen and thirty minutes but may last up to ninety minutes, ISAs are able to put customers on one of two forms of hold: "HOLD AUX," which plays music for the customer, or "silent hold" (i.e., mute), where a customer hears nothing. Use of a silent hold causes a red light to go on at an ISA's workstation. For unpaid lunch breaks, ISAs log out; paid breaks require use of "BREAK AUX." Dish authorizes ISAs working eight-hour shifts to take thirty minutes of paid break time and those working ten-hour shifts are authorized to take thirty-five minutes.

Dish disciplines its ISAs for various offenses, called "Tier violations." These offenses range from failing to up-sell, to authorizing payment without a customer's consent, to using profanity on a call. Tier violations are punished by docking ISAs' commissions. Dish typically uncovers such violations by one of three means: (1) coaches occasionally monitor calls by listening in via headset; (2) the Quality Assurance unit reviews the recordings of two calls per week for each ISA; and (3) the Sales Integrity Team investigates ISAs with high cancellation rates. ISAs lose commissions because of Tier violations.

Mr. Rabb complained about this policy to both his colleagues and supervisors, including a senior vice president to whom Ms. Evans transmitted a letter on Mr. Rabb's behalf in August of 2013. At one point, Mr. Rabb even characterized Dish's commission-docking practice to Ms. Evans as "stealing." R. at 59, 159–60 (Tr. of Hr'g, Mr. Rabb's test., dated Jan. 6, 2015); R. at 336 (Tr. of

4

Hr'g, Ms. Evans's test., dated Jan. 7, 2015).

Mr. Rabb's discontent led him to file a complaint with the CDOL, which responded by informing Mr. Rabb that it was without statutory jurisdiction to regulate compensation structures. Mr. Rabb discussed the CDOL complaint with his coach, Mr. Appelhans. On January 30, 2014, Mr. Rabb first met with a lawyer regarding the potential suit and was accompanied by a coworker. After that, he solicited as many as fifteen of his coworkers to join him as plaintiffs.

On February 18, Mr. Rabb received a "final warning" for allegedly violating the solicitation policy after two of his coworkers complained to management. The same day that Mr. Rabb received the final warning, he also asked for a former employee's phone number for the purpose of soliciting participation in the lawsuit. Ms. Evans twice sought to fire Mr. Rabb for these actions, though she was unsuccessful. But within three weeks, Mr. Rabb was fired.

On March 4, Mr. Rabb used silent hold at the end of a call to use the bathroom. Ms. Evans, Mr. Gass, and Mr. Appelhans were in a meeting in a glass-walled conference room a short distance away. Apparently, Mr. Appelhans first observed the illuminated red light at Mr. Rabb's workstation, evincing his use of silent hold. Upon Mr. Rabb's return, Mr. Gass was waiting for him at his desk. This surprised Mr. Rabb: Mr. Gass appeared upset over something. In Mr. Rabb's view, Mr. Gass was upset over a practice Mr. Rabb had repeatedly followed for

5

the two years of his employment at Dish—that is, placing callers on silent hold while going on brief restroom breaks—with the knowledge and tacit consent of his coaches. Mr. Rabb was terminated on March 7 via a notice that cited the March 4 incident and an incident that had occurred on February 28, where Mr. Rabb placed his system in COACHING AUX for a few minutes while he went to the restroom and Mr. Appelhans counseled him not to do that. Mr. Rabb contended in signing his termination notification that his behavior—going to the restroom during calls—had been ongoing and was known to his coaches; yet, he had never received any oral warnings about the practice.

On June 18, 2014, Mr. Rabb filed a charge against Dish with the Board. The Board's General Counsel filed its complaint against Dish on August 27. An ALJ conducted a hearing regarding the matter on January 6 and 7, 2015. At the hearing, Dish presented testimony from Ms. Evans and Mr. Gass, as well as a few ISAs, and presented evidence of other terminations based on conduct it considered analogous to Mr. Rabb's, which it characterized as "call avoidance." *Id.* at 840 (Decision, dated Mar. 26, 2015). Dish offered evidence that silent holds "should be limited to short questions for Coaches, sneezes or coughs, or for quick account reviews" and that "silent hold usage is subject to abuse" and is "a way to avoid calls." *Id.* at 840 n.18. The ALJ ruled against Dish on all issues on March 26, 2015. Dish appealed, and the Board issued its final decision on March 3, 2016.

The Board substantially adopted the ALJ's decision, only modifying its remedial order in minor respects. The Board concluded that (1) Dish had maintained an unlawful nonsolicitation policy in violation of § 8(a)(1) of the NLRA (i.e., 29 U.S.C. § 158(a)(1)) because it barred solicitation in work areas during nonwork time and required employees to obtain management approval before soliciting; (2) Dish had violated § 8(a)(1) of the NLRA by disciplining Mr. Rabb pursuant to that unlawful policy; and (3) Dish violated § 8(a)(1) of the NLRA by terminating Mr. Rabb for his protected concerted activities.

## II. DISCUSSION

### A.    Standard of Review

The NLRA requires that, on judicial review, "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). "We will grant enforcement of an NLRB order when the agency has correctly applied the law and its findings are supported by substantial evidence in the record as a whole." *NLRB v. Interstate Builders, Inc.*, 351 F.3d 1020, 1027 (10th Cir. 2003) (quoting *Miera v. NLRB*, 982 F.2d 441, 444 (10th Cir. 1992), *aff'd*, 510 U.S. 317 (1994)). "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. U.S. Postal Serv.*, 486 F.3d 683, 687 (10th Cir. 2007) (quoting *NLRB v. Velocity Express, Inc.*, 434 F.3d 1198, 1201 (10th Cir. 2006)).

7

Review under the substantial evidence standard is narrow and deferential. "Our job isn't to make the call ourselves, but only to ask whether a reasonable mind could have made the call the NLRB made." *Laborers' Int'l Union of N. Am., Local 578 v. NLRB*, 594 F.3d 732, 734 (10th Cir. 2010). "We are required to look only for the existence of *some evidence* from which a reasonable mind could conclude as the NLRB did, and in doing so we take special care to remember that we 'do not weigh the credibility of one witness against another nor do we search for contradictory inferences.'" *Id.* at 740 (emphasis added) (quoting *Osteopathic Hosp. Founders Ass'n v. NLRB*, 618 F.2d 633, 636 (10th Cir. 1980)). And we also do not "re-weigh the evidence or second guess the NLRB's factual inferences." *Velocity Express*, 434 F.3d at 1201. In short, we do not reverse simply because "an appellate panel may have decided the matter differently." *Id.*

As to questions of law, our review is de novo, though we accord "considerable deference" to the Board's interpretation of the NLRA. *Norris, a Dover Res. Co. v. NLRB*, 417 F.3d 1161, 1167 (10th Cir. 2005) (quoting *NLRB v. Okla. Fixture Co.*, 79 F.3d 1030, 1033 (10th Cir. 1996)); *accord Pub. Serv. Co. of Colo. v. NLRB*, 405 F.3d 1071, 1077 (10th Cir. 2005) ("[F]or the Board to prevail, it need not show that its construction is the *best* way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one." (quoting *Four B Corp. v. NLRB*, 163 F.3d 1177, 1182 (10th Cir. 1998)). Because the NLRA's broad language reflects Congress's delegation to the Board

8

of "considerable authority," we have recognized that the Board is due considerable deference in particularizing and elaborating on the NLRA's standards. *Coastal Derby Ref. Co. v. NLRB*, 915 F.2d 1448, 1451 (10th Cir. 1990). "To the extent that the Board's resolution of an issue involves the application of a rule that 'fill[s] the interstices of the broad statutory provisions,' that rule must be accorded 'considerable deference.'" *NLRB v. Triple C Maint., Inc.*, 219 F.3d 1147, 1151 (10th Cir. 2000) (quoting *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990)); *see also ConAgra Foods, Inc. v. NLRB*, 813 F.3d 1079, 1086 (8th Cir. 2016) ("Although the word 'solicitation' is not found in the Act, the Board's definition of that term forms, in part, the contours of rights guaranteed employees under the Act and so amounts to a construction of it."). Thus, "[i]f the Board adopts a rule that is rational and consistent with the Act, then the rule is entitled to deference from the courts." *NLRB v. Okla. Installation Co.*, 219 F.3d 1160, 1163 (10th Cir. 2000) (quoting *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987)); *accord Curtis Matheson Sci.*, 494 U.S. at 787; *Intermountain Rural Elec. Ass'n v. NLRB*, 984 F.2d 1562, 1567–68 (10th Cir. 1993).

## B. Statutory Background

Section 10 of the NLRA, 29 U.S.C. § 160, empowers the Board "to prevent any person from engaging in any unfair labor practice . . . . affecting commerce." Section 8 of the NLRA establishes that "unfair labor practices" include when an

9

employer attempts "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [i.e., § 7 of the NLRA]." *Id.* § 158. Section 7 (i.e., 29 U.S.C. § 157) protects not only the right of employees to organize and participate in a variety of organized labor activities, but also "to engage in *other concerted activities* for the purpose of collective bargaining or *other mutual aid or protection*." *Id.* § 157 (emphases added).

The NLRB and the courts have construed these provisions to protect employees in "resort[ing] to administrative and judicial forums," *Eastex, Inc. v. NLRB*, 437 U.S. 556, 566 (1978), including filing lawsuits against employers over the terms or conditions of employment. *See, e.g.*, *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147, 1152 (7th Cir. 2016) (collecting cases), *cert. granted*, 137 S. Ct. 809 (2017). Thus, Mr. Rabb's attempts to recruit other employees for a lawsuit over Dish's compensation practices clearly constituted protected, concerted action.

## C. Merits

Dish challenges the Board's finding of unfair labor practices in: (1) its nonsolicitation policy; (2) its discipline of Mr. Rabb pursuant to that nonsolicitation policy; and (3) its termination of Mr. Rabb. We address each claim in turn.

### 1. Nonsolicitation Policy

It is a long-standing rule of labor law that

time outside working hours . . . is an employee's time to use as

> he wishes without unreasonable restraint, although the employee is on company property. It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property.

*See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n.10 (1945).[1] The Board, moreover, has concluded that policies requiring management's permission for solicitation are unlawful because they threaten to chill the exercise of workers' rights under the Act. *See Mercury Marine-Div. of Brunswick Corp.*, 282 N.L.R.B. 794, 794–95 (1987).

However, the NLRB and the courts also have long recognized that under a "special circumstances" exception, in certain contexts, an employer may prohibit solicitation by employees even during nonwork hours. *See Marshall Field & Co.*, 98 N.L.R.B. 88, 98–99 (1952), *enforced in part*, 200 F.2d 375 (7th Cir. 1952); *see also Double Eagle Hotel & Casino v. NLRB*, 414 F.3d 1249, 1253–54 (10th Cir.

---

[1] However, historically, the Board has not deemed unlawful under the NLRA employer prohibitions of the solicitation of *on-duty* employees by off-duty employees. *See BJ's Wholesale Club, Inc.*, 297 N.L.R.B. 611, 615 (1990) ("[A manager] also told Dryden that she could not 'take on clock employees away from their work' [to solicit] and that Dryden had 'been observed leaving her work station,' both of which statements [the manager] could properly make."); *see also Brocal Corp.*, 276 N.L.R.B. 631, 664 (1985) ("[The manager] failed to make it clear that Clark could distribute union cards during periods when neither he *nor* the recipients were expected to be actively working . . . ." (emphasis added)); *cf. Stoddard-Quirk Mfg. Co.*, 138 N.L.R.B. 615, 619–20 (1962) ("The first requirement for an employee seeking to solicit his fellow employees is that he find a time and place appropriate for such solicitation."). And, here, the Board has not objected to the portion of Dish's nonsolicitation policy that reaches such solicitations of on-duty employees.

11

2005). For instance, as relevant here, the Board applied the special circumstances exception to permit a retail store employer to entirely prohibit solicitation, even during nonwork time, as to "that portion of the store devoted to selling purposes." *Marshall Field*, 98 N.L.R.B. at 92.

Dish's policy prohibited employees from soliciting "during work time *or* in work areas except as specifically *authorized in advance* by a vice president or higher." R. at 594 (GC Ex. 17, Dish Network Employee Handbook, dated Sept. 2009) (emphases added). The Board held that Dish's nonsolicitation policy was unlawful because it prohibited "work area solicitations that occur during *nonwork* time" and required "management's approval before embarking on such solicitations." *Id.* at 842 (emphasis added). In upholding the ALJ's decision, the Board declined to apply the special circumstances exception to Dish's call center. The Board stated: "[W]e reject the Respondent's attempt to characterize its call center as a retail sales floor. The Respondent's call center is not a retail establishment, nor is there a selling floor where customers are physically present." *Id.* at 831 n.1 (Decision & Order, dated Mar. 3, 2016) (citations omitted).

Dish challenges on appeal the Board's determination that its call center does not qualify for the special circumstances exception accorded to retail sales floors. However, the Board's finding is supported by substantial evidence. Specifically, the Board pointed to the plain and undisputed facts in the record that

12

Dish was not operating a retail business and that there is no sales floor where customers were physically present—facts that adequately and reasonably distinguish Dish's case from those sales floors where the Board has applied the special circumstances exception. *See Marshall Field*, 98 N.L.R.B. at 92.

Contrary to Dish's assertion that its call center "is no different than a customer entering a retail store and deciding whether they want to buy a product," R. at 828 (Reply Br. in Supp. of Resp't's Exceptions to ALJ's Decision, dated June 4, 2015), the physical absence of customers and the nonretail nature of Dish's operation provide a reasonable basis for distinguishing Dish's circumstances from cases like *Marshall Field.* Unlike in a call center where communications with customers are telephonic, in a retail store setting, a customer may well be put off by the presence of off-duty employees soliciting one another on the sales floor. Absent a situation where off-duty ISAs speak so loudly that their conversations interfere with the customer interactions of on-duty ISAs—an eventuality that can be remedied by measures well short of a total ban on solicitations—solicitations between off-duty ISAs do not present the sort of risk to customer interactions that the special circumstances exception, as applied in *Marshall Field*, addresses. On these facts, we cannot say that the Board was without evidence or reached an unreasonable conclusion. "[A] reasonable mind could have made the call the NLRB made." *Laborers' Int'l Union of N. Am., Local 578*, 594 F.3d at 734.

13

Dish contends here, however, that the Board incorrectly held that "the sales-floor exception requires physical presence of customers." Pet'r's Opening Br. at 20. We discern nothing in the Board's decision, however, that indicates that it was announcing a per se rule; rather, it addressed Dish's specific contention that "its call center [was] a sales floor," *id.* at 19, by distinguishing *Marshall Field* where the exception was held to be applicable to sales floors.

Dish complains that the Board's narrow reading of the special circumstances exception, as applied to sales floors, "ignores the realities of contemporary commerce and the modern workplace." *Id.* at 21. But, as Dish's own cited authority recognizes, it is the Board's job—not ours—to "adapt the Act to changing patterns of industrial life." *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266 (1975). In *J. Weingarten*, the Court stated:

> It is the province of the Board, not the courts, to determine whether or not the "need" exists [for such adaptation] in light of changing industrial practices and the Board's cumulative experience in dealing with labor-management relations. For the Board has the "special function of applying the general provisions of the Act to the complexities of industrial life."

*Id.* (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236 (1963)). As long as the Board's decisions in this regard are not "unreasonable or unprincipled," we defer to them. *NLRB v. Bartlett-Collins Co.*, 639 F.2d 652, 657 (10th Cir. 1981) (quoting *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979)) ("Under the deferential review accorded the Board in its 'special function of applying the

14

general provisions of the Act to the complexities of industrial life,' all that is necessary is that its construction of what is a mandatory bargaining subject 'is not an unreasonable or unprincipled' one." (citations omitted) (quoting, respectively, *J. Weingarten*, 420 U.S. at 266; *Ford Motor Co.*, 441 U.S. at 497)). And the Board's decision here not to extend the special circumstances exception to (admittedly sales-focused) call centers, like Dish's, is neither unreasonable nor unprincipled.[2]

Dish's next argument appears to misconstrue the standard for finding a presumptively unlawful prohibition of solicitation. Dish argues that the Board had the "burden of establishing that 'work areas,' as used in the policy, exist anywhere other than the call center." Pet'r's Opening Br. at 22. But the ALJ's decision hinged not on the locations where Dish barred solicitation but on the fact that Dish had barred solicitation "during nonwork time." R. at 842; *see also UPS Supply Chain Sols., Inc.*, 357 N.L.R.B. 1295, 1296 (2011) ("Employers may ban solicitation in working areas during working time but may not extend such bans to

---

[2]     While it is true, as Dish argues, that the special circumstances exception is concerned with maintaining "production or discipline," Pet'r's Reply Br. at 9 (citing *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 517 (1978) (Powell, J., concurring)), and that the doctrine does not turn solely on whether customers are present, *id.* at 10; Pet'r's Opening Br. at 20 (citing *Marshall Field*, 98 N.L.R.B. at 92), we are not persuaded that, based on these truths, we must conclude that the Board was obliged to find the presence of special circumstances in Dish's case. That is a decision that, absent limited circumstances noted *supra*, is left to the reasonable discretion of the Board.

working areas during nonworking time."). There is no question that Dish's policy banned solicitation inside the call center even when employees were off duty. R. at 594 ("[E]mployees . . . may not . . . solicit for any other reason during work time *or* in work areas . . . ." (emphasis added)).

Dish's final argument, raised only in its reply brief, concerns its policy of requiring employees to obtain management approval before soliciting; this was an additional ground for the Board's finding of unlawfulness. Dish characterizes the Act as prohibiting *only* solicitation policies that require preapproval of solicitation "on an employee's free time *and* in nonwork areas." Pet'r's Reply Br. at 12 (quoting *Brunswick Corp.*, 282 N.L.R.B. at 795). But the authority upon which Dish relies, *Brunswick Corp.*, is unavailing. There, the Board held that "[t]he rule is unlawful on its face because it requires employees to obtain Respondent's permission before engaging in the protected activity of solicitation *in work areas during nonworking time* or even in the lunchroom and lounge areas during breaks and lunch periods." 282 N.L.R.B. at 798 (emphasis added). Dish's policy required preapproval of solicitation "during work time *or in work areas*." R. at 594 (emphasis added). The latter restriction (i.e., work areas) patently included solicitation in work areas during nonwork time. Such a rule is per se unlawful under *Brunswick Corp.* Thus, Dish's reliance on that case is misplaced and its argument is without merit.

In sum, we conclude that the Board did not err or lack substantial evidence

16

in finding that Dish's nonsolicitation policy was unlawful. We turn now to Dish's challenge to the Board's finding of unlawful discipline.

## 2. Unlawful Discipline

The Board found that Dish unlawfully disciplined Mr. Rabb by issuing him a final warning for violating Dish's unlawful nonsolicitation policy. It is undisputed that discipline pursuant to an unlawful work rule is itself unlawful if the employee has engaged in protected conduct.[3] *See Cont'l Grp., Inc.*, 357 N.L.R.B. 409, 411–12 (2011). Dish argues (1) that Mr. Rabb was disciplined for distribution rather than solicitation, because he was distributing post-it notes, *see* Pet'r's Opening Br. at 23; Pet'r's Reply Br. at 13–17; and (2) that the Board was required to apply *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964), such that "after the employer carries its burden of showing that it held an honest belief that the employee engaged in misconduct, the burden then shifts to the General

---

[3]     "[I]n situations in which the conduct for which an employee is disciplined under an overbroad rule clearly falls within the protection of Section 7 of the Act (e.g., concerted solicitation, distribution, or discussion of terms and conditions of employment)—and even though the employer lawfully would be entitled to place restrictions on that conduct via a narrowly tailored rule . . . in such situations, the Board will . . . find that the discipline violates the Act . . . ." *Cont'l Grp., Inc.*, 357 N.L.R.B. 409, 411–12 (2011). In *Continental*, the Board clarified that discipline pursuant to an unlawfully overbroad rule is not itself unlawful if the conduct for which the employee is disciplined "is not similar to conduct protected by the Act." *Id.* at 412. However, the Board held in the same decision that even if the employee's action is not concerted, so long as the conduct "touches the concerns animating Section 7 (e.g., conduct that seeks higher wages)," then the discipline imposed for that conduct pursuant to an overbroad rule is unlawful. *Id.*

17

Counsel to 'affirmatively show that the misconduct did not in fact occur.'" Pet'r's Opening Br. at 24 (quoting *MCPC Inc. v. NLRB*, 813 F.3d 475, 488 (3d Cir. 2016)).

Dish's first argument attempts to rely on the Board's more lenient treatment of nondistribution rules. The Board has long distinguished between nondistribution and nonsolicitation rules, giving the employer greater latitude to regulate distribution. *See, e.g.*, *Beverly Enters.-Haw., Inc.*, 326 N.L.R.B. 335, 335 & n.2 (1998) ("It is well settled that '[r]ules prohibiting distribution of literature are presumed valid unless they extend to activities during nonworking time *and in nonworking areas*.'" (alteration in original) (emphasis added) (quoting *St. John's Hosp. & Sch. of Nursing, Inc.*, 222 N.L.R.B. 1150, 1150 (1976), *enforced in part*, 557 F.2d 1368 (10th Cir. 1977))); *see also Stoddard-Quirk*, 138 N.L.R.B. at 619 ("[S]olicitation, being oral in nature, impinges upon the employer's interests only to the extent that it occurs on working time, whereas distribution of literature, because it carries the potential of littering the employer's premises, raises a hazard to production whether it occurs on working time or nonworking time."). Were the discipline of Mr. Rabb in fact for distribution rather than solicitation, that discipline might well be lawful (though we need not definitively opine on the matter). But Dish's argument amounts to an attempt to recharacterize post hoc the discipline meted out to Mr. Rabb.

The Board's determination that Mr. Rabb was disciplined for solicitation

18

and not distribution is supported by substantial evidence: namely, the written discipline form itself and the emails of the call center manager, Ms. Evans. *See* R. at 569 (GC Ex. 15, Employee Consultation, dated Feb. 18, 2014) ("David Rabb was witnessed *soliciting* his co-workers to seek the services of an attorney. *Soliciting* employees to seek the services of an attorney during work time and in work areas is a clear violation of the expectation set regarding *Solicitation* in the Workplace on page 22 in the Employee Handbook." (emphases added)); R. at 615 (GC Ex. 24, Evans email, dated Feb. 20, 2014) ("We were informed by 2 agents . . . that David Rabb was *soliciting* for people to call his attorney to join his 'case' he is building against DISH . . . . [T]he decision was made to place David on a final warning for violating the *no solicitation* policy in the employee handbook." (emphases added)).

This evidence is sufficient to sustain the Board's decision. In other words, the Board's interpretation is supported by substantial evidence, and our task is not to consider whether the Board's interpretation is the best one. *Pub. Serv. Co. of N.M. v. NLRB*, 692 F.3d 1068, 1079 (10th Cir. 2012) ("It is, after all, [Public Service Co.'s] burden to do much more than to *reargue the facts*. It must go a step farther and 'show affirmatively' that the Board's findings are ones *no reasonable mind could accept*." (emphases added) (quoting *Brown v. Comm'r of Internal Revenue*, 448 F.2d 514, 517 (10th Cir. 1971))). Dish's post hoc attempts to characterize its discipline as for distribution rather than solicitation cannot

19

overcome the substantial-evidence standard of review.

As to Dish's legal argument relying on the Supreme Court's *Burnup*
decision, that argument fails because Dish never raised it before the Board. The
NLRA limits the jurisdiction of a reviewing court to arguments raised before the
Board: "No objection that has not been urged before the Board, its member,
agent, or agency, shall be considered by the court, unless the failure or neglect to
urge such objection shall be excused because of extraordinary circumstances." 29
U.S.C. § 160(e). We have recognized that this provision of the Act is a
jurisdictional bar to considering arguments not raised before the agency. *Pub.
Serv. Co. of N.M.*, 692 F.3d at 1075–77 ("The trouble is, we have no authority to
hear these objections because [Public Service Co.] never presented them to the
Board. . . . [W]e are confident that § 160(e) is a jurisdictional limit on this
court's authority . . . .").

Nowhere in the record below did Dish argue to the Board that the ALJ
should have applied *Burnup*. Dish says that the issue did not become live until
"the Board 'rejected' Rabb's distribution of post-it notes. Unlike the Board, the
ALJ did not affirmatively 'reject' the fact that Rabb was disciplined for
distributing post-it notes." Pet'r's Reply Br. at 14–15. Dish's argument
effectively concedes that it failed to raise *Burnup* before the Board. Furthermore,
whether or not the ALJ rejected Dish's contention that Mr. Rabb was disciplined
for distribution rather than solicitation is analytically distinct from the question of

20

what legal standard should be applied in determining whether Mr. Rabb was unlawfully disciplined. Because Dish never presented the *Burnup* standard for the Board to consider, we are barred from considering Dish's argument based on it.

Because the Board's finding that Dish unlawfully disciplined Mr. Rabb is supported by substantial evidence in the record, and we lack authority to reach Dish's arguments concerning the *Burnup* standard, we conclude that Dish has failed to carry its burden on its objections to the Board's determination of unlawful discipline.

### 3. Unlawful Termination

Dish next challenges the Board's determination that Dish violated § 8(a) of the NLRA by discharging Mr. Rabb for, at least in part, his "protected concerted activity" in "solicitation of [his] coworkers to join a wage and hour suit against their employer." R. at 842; *see* Pet'r's Opening Br. at 24–36. Dish advances four arguments: (1) that, at step one of the *Wright Line* analysis,[4] the Board failed to show the required causal connection between alleged animus and the termination of Mr. Rabb; (2) that, at *Wright Line* step two, the Board improperly double counted animus; (3) that the Board's comparator analysis is flawed (or not supported by substantial evidence); and (4) that the Board improperly supplanted Dish's business judgment with its own. *See* Pet'r's Opening Br. at 24–36.

---

[4]     *See Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981).

21

The *Wright Line* standard generally requires a two-step inquiry: the General Counsel must first make a prima facie showing of "a discharge or other adverse action that is based in whole or in part on anti-union animus—or as the Board now puts it, that the employee's protected conduct was a substantial or motivating factor in the adverse action." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983), *abrogated on other grounds by Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994). If the General Counsel carries its burden on this prong of the analysis, then to avoid liability, the employer must successfully carry its burden of persuasion on an affirmative defense—*viz.*, a showing that the same "action[] would have been [taken] regardless of [any] forbidden motivation." *Id.*

### a. *Wright Line*: Step One

Dish helpfully summarizes its *Wright-Line*-step-one objections:

> (1) the Board failed to require, much less establish, a causal link between any "animus" or unlawful motivation and Rabb's termination; (2) the Board failed to substantiate any findings of "animus" from the record; and (3) the Board failed to consider the entire record at the first ("*prima facie*") phase of analysis.

Pet'r's Reply Br. at 17 n.6 (citation omitted). These boil down to two objections: first, that the Board applied the improper legal standard by omitting a causation requirement and, second, that the Board's findings are not supported by substantial evidence. Neither argument is persuasive.

As a preliminary matter, Dish cites a nonprecedential decision of this court

22

for the proposition that to make out a prima facie case, a three-pronged showing

is required:

> (1) that the employee/union member engaged in protected activity; (2) the employer/union has knowledge of this act; (3) animus or hostility toward this activity was a motivating factor in the employer/union's decision to take the adverse action in question against the employee/union member.

Pet'r's Opening Br. at 25 (quoting *Int'l Union of Operating Eng'rs, Local 627 v.*

*NLRB*, 635 F. App'x 480, 482 (10th Cir. 2015) (unpublished)).

Our circuit, however, has never adopted this three-pronged test.[5]  Indeed, in

a recent published decision, we recognized that the step-one inquiry requires the

General Counsel to "establish that the employee's protected conduct was a

substantial or motivating factor in the discharge decision."  *Interstate Builders*,

351 F.3d at 1027 ("In general, for both refusal-to-hire and wrongful-termination

cases, the critical question is the company's motivation for the challenged

conduct; specifically, we focus on whether 'anti-union animus' motivated that

conduct."); *see MJ Metal Prods., Inc. v. NLRB*, 267 F.3d 1059, 1065 (10th Cir.

2001) ("Initially, the [] General Counsel must establish that the employee's

protected conduct was a substantial or motivating factor in the discharge decision

---

[5]     At most, we have required that "[t]he totality of the evidence presented must establish directly or circumstantially that the employer had knowledge of employees' protected activities."  *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1551 (10th Cir. 1996).  But, as will be shown *infra*, this is merely a logical elaboration of the standard that the General Counsel must meet to make out a prima facie case under *Wright Line* step one.

23

. . . ." (quoting *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1550 (10th Cir. 1996))). However, the NLRB has used such a three-pronged test. *See, e.g.*, *La Gloria Oil & Gas Co.*, 337 N.L.R.B. 1120, 1123 (2002), *enforced*, 71 F. App'x 441 (5th Cir. 2003) (unpublished).

At bottom, the difference between the two standards seems to be academic at best. This is because the first and second prongs dealing with the existence of and the employer's knowledge of some protected activity are logical antecedents to any finding that the employer's action was motivated by the employee's protected activity. If there is no protected activity, the employer cannot be motivated by it in discharging an employee; similarly, if protected activity has occurred but the employer is ignorant of it, that activity cannot motivate the employer's decision. There is no factual question as to whether Mr. Rabb engaged in protected activity or whether Dish knew it. Therefore, this test would add nothing here to the rubric that we have adopted in published decisions. In any event, because it emanates from controlling precedent, we are obliged to adhere to that rubric.

Dish asserts that, though the General Counsel must prove "causation," the Board "effectively eliminate[d] causation from the *prima facie* test" because "[i]n the Board's view, once 'animus' is conjured from the record, there is no need to establish any 'additional undefined "nexus" between the employee's protected activity and the adverse action.'" Pet'r's Opening Br. at 25–26 (quoting R. at 831

24

n.1). We reject this contention. First, it should be noted that the General Counsel does not deny that *Wright Line* step one requires it to "prov[e] that an employee's protected activity was a motivating factor in the employer's adverse employment decision"; it simply rejects the notion that there is "some additional showing [required] of particularized animus towards the employee's own protected activity or [the need] to further demonstrate some additional, undefined 'nexus' between the employee's protected activity and the adverse action." R. at 831 n.1.

Dish's argument appears to be based in part on a misunderstanding regarding the burden that the General Counsel carries. "Causation" does not require direct evidence. *Cf.* Pet'r's Reply Br. at 18, 20–21 ("The General Counsel and the Board appear to believe it is enough to cite to 'animus'—even if there is no evidence the animus *contributed* to the employer's decision. . . . [T]here is no evidence of a corporate directive to discipline employees involved in protected conduct or finding of pretext . . . ."). And, based on the ALJ's credibility determinations—to which great deference is owed, *see Ready Mixed Concrete*, 81 F.3d at 1551 ("We 'refuse to substitute our judgment on the credibility of witnesses for that of the ALJ, absent "extraordinary circumstances."'" (quoting *McLane/W., Inc. v. NLRB*, 723 F.2d 1454, 1458 (10th Cir. 1983)))—and the rest of the record, we conclude that substantial evidence supports the Board's determination that the General Counsel made out a prima facie showing that Mr. Rabb's protected conduct was a motivating factor in his discharge.

25

Dish does not contest that Mr. Rabb was engaged in protected activity, only that the Board failed to show animus and failed to consider the entire record. *See* Pet'r's Reply Br. at 17 & n.6. Specifically, Dish argues that the unlawful discipline that the Board cites as a basis for a finding of "animus toward its employees' exercise of Sec. 7 rights," R. at 831 n.1, "does not demonstrate *intent*," Pet'r's Opening Br. at 26. This argument fails because we have previously held that the "commission of other unfair labor practices" may be considered as an item of circumstantial evidence tending to show impermissible motivation for a discharge. *MJ Metal Prods.*, 267 F.3d at 1065; *see also Interstate Builders*, 351 F.3d at 1034; *Presbyterian/St. Luke's Med. Ctr. v. NLRB*, 723 F.2d 1468, 1479 (10th Cir. 1983). The only legal authority that Dish cites to support its position is *Webco Industries, Inc. v. NLRB*, 217 F.3d 1306, 1313 (10th Cir. 2000); it does so specifically for the proposition that an employer's intent is "irrelevant" for purposes of unlawful discipline under an unlawful solicitation policy. *See* Pet'r's Opening Br. at 26. However, we fail to see how *Webco Industries* avails Dish. Tellingly, Dish is unable to cite to any authority for the proposition that it actually seems to champion—*viz.*, because intent is irrelevant to the question of whether an employer has unlawfully disciplined an employee pursuant to an unlawful policy, therefore only evidence of an "intent-based" unfair labor practice can contribute to a finding of animus. *See* Pet'r's Reply Br. at 21–22 (emphasis omitted).

26

It should not be difficult to understand why discipline for protected activity pursuant to an unlawful policy supports an inference of animus towards the protected activity. The enforcement of an openly unlawful disciplinary policy—i.e., unlawful because it prohibits protected activity—suggests that the employer harbors animus towards the protected activity that the policy prohibits. Furthermore, even were Dish's argument to have some force and we were *not* to consider the unlawful discipline, there is more than enough evidence in the record to constitute substantial evidence for a finding of animus towards Mr. Rabb's protected activity.[6]

In this regard, the ALJ found that Ms. Evans had averred that she sought Mr. Rabb's *termination* solely for having violated the nonsolicitation policy. R.

---

[6] Dish cites a Fourth Circuit case for the proposition that the Board improperly and prematurely shifted the burden to Dish by failing to consider the entire record—specifically, Dish's explanation for Mr. Rabb's firing, the length of Mr. Rabb's complaints regarding Dish's pay structure, Ms. Evans's passing Mr. Rabb's letter on to a company vice president, and Ms. Evans's having assisted Mr. Rabb after a final warning in 2012 for rudeness and call avoidance. *See* Pet'r's Opening Br. at 27–28. The Fourth Circuit case held that the Board must consider the employer's proffered explanation for the termination at *Wright Line* step one. *See NLRB v. CWI of Md., Inc.*, 127 F.3d 319, 332 (4th Cir. 1997). Of course, the Fourth Circuit's opinion is not binding precedent in this circuit. Further, our standard of review (as well as the NLRA itself) is clear that the Board's findings must simply be supported by substantial evidence. Thus, even were we to accept the premise that the Board should consider the employer's explanation at *Wright Line* step one, rather than considering it only at step two, the Board's finding that the General Counsel carried its burden in making out a prima facie case that Mr. Rabb's protected conduct was a motivating factor in his termination nonetheless rests on substantial evidence for the reasons laid out *infra*.

at 839; *see also* R. at 615 (Ms. Evans admitted that she twice sought Mr. Rabb's termination for solicitation, once for the occasion for which he was disciplined and shortly thereafter for asking for contact information of a former employee in order to solicit him to join Mr. Rabb's lawsuit); R. at 370–72 (Ms. Evans testified that, upon hearing of Mr. Rabb's asking for contact information of former employees, she said something to the effect of: "Is he still doing this?"). Notably, Dish hardly mentions Ms. Evans's dual attempts to fire Mr. Rabb for protected conduct within about three weeks of his firing.

Finally, the ALJ and the Board relied on the temporal proximity of Mr. Rabb's protected conduct to his termination—specifically, both his "filing [of] a [CDOL] complaint and soliciting workers to join his lawsuit." *Id.* at 843. Even were we to agree with Dish's argument that the CDOL complaint is not sufficiently close in time to Mr. Rabb's termination as a matter of law, the proximity of Ms. Evans's attempts to fire Mr. Rabb for protected conduct would still have furnished the Board with persuasive evidence of animus.

The balance of Dish's arguments on *Wright Line* step one of the analysis is that the Board failed to consider the entire record. *See* Pet'r's Opening Br. at 27–28; Pet'r's Reply Br. at 23–24. In essence, Dish wishes the ALJ had believed it and its witnesses' version of events. But the ALJ made damning credibility findings, which we will not reconsider. *See* R. at 841–42 (finding Ms. Evans and Mr. Gass "to be wholly unbelievable witnesses, who appeared keenly focused on

28

advancing their case, at the expense of offering truthful testimony").

In sum, despite Dish's many complaints of mischaracterizations and misstatements, there is more than substantial evidence to support the Board's finding that the General Counsel carried its initial burden at *Wright Line* step one.

### b. *Wright Line*: Step Two

On step two of the *Wright Line* analysis, Dish argues that the ALJ improperly double counted animus, made no finding of pretext, improperly compared Mr. Rabb's discipline for use of silent hold with the evidence that Dish offered of purportedly comparable instances of discipline, and substituted the ALJ's own judgment for Dish's business judgment. We address each argument in turn.

Dish contends that the ALJ and the Board impermissibly double counted evidence of unlawful motivation or animus for purposes of evaluating whether the employer made out its affirmative defense. Pet'r's Opening Br. at 29; Pet'r's Reply Br. at 25. Insofar as the Board did consider evidence of unlawful motivation in its *Wright Line* step two analysis, at least at first blush, the authorities seem to belie the notion that such a methodology was impermissible. *See Wright Line*, 251 N.L.R.B. at 1091 (finding defendant's affirmative defense undermined by evidence "suggest[ing] a predetermined plan to discover a reason to discharge [an employee] and thus rid the facility of a union activist"); *see also Interstate Builders*, 351 F.3d at 1034 (observing that the employer had "advanced

pretextual explanations for" the employee's termination, that "the NLRB may properly consider the 'credibility of [the company's] explanation of the reasons for the discharge,'" and so an employer defendant's "flimsy or unsupported explanation may affirmatively suggest that the employer has seized upon a pretext to mask an anti-union motivation," while determining whether the employer defendant had made out its affirmative defense (alteration in original) (first quoting *MJ Metal Prods.*, 267 F.3d at 1065; then quoting *NLRB v. Dillon Stores*, 643 F.2d 687, 693 (10th Cir. 1981))); *Intermountain Rural Elec. Ass'n*, 732 F.2d at 760 ("The ALJ's conclusions, adopted by the Board and supported by the record, included the conclusion that the spoiled food incident was 'seized upon as a convenient pretext to punish [Tate] for her union involvement;' that the employer 'was intent upon building a case against Tate' . . . . Thus the findings can fairly be read, with record support, to rule out the possibility of the employer's prevailing on the theory of a *Wright Line* defense . . . ." (alteration in original)). However, we need not definitively opine on the merits of Dish's double-counting contention. That is because, even if we do not consider the evidence that Dish's proffered reasons for firing Mr. Rabb were a pretext for a predetermined plan to discover a reason to discharge him, we would still conclude that the Board's decision is supported by substantial evidence.

The ALJ's credibility determinations as to Ms. Evans and Mr. Gass almost entirely eviscerate any attempt by Dish to meet its burden on *Wright Line* step

30

two. The ALJ found Ms. Evans and Mr. Gass "to be wholly unbelievable witnesses, who appeared keenly focused on advancing their case, at the expense of offering truthful testimony." R. at 841. "Credibility determinations are particularly the province of the ALJ and the Board. We 'refuse to substitute our judgment on the credibility of witnesses for that of the ALJ, absent "extraordinary circumstances."'" *Ready Mixed Concrete*, 81 F.3d at 1551 (citation omitted) (quoting *McLane/W.*, 723 F.3d at 1458). Much of the evidence for Dish's defense was presented through the testimony of Ms. Evans and Mr. Gass. *See, e.g.*, R. at 840 (stating that Ms. Evans had "explained that Dish ha[d] repeatedly told ISAs that excessive silent hold usage was prohibited" and she concluded "that, on this basis, . . . termination was warranted"). In light of the ALJ's credibility determinations, Dish's account of Mr. Rabb's firing and the reasons for it fall apart.

Further, one current and two former Dish employees testified that (1) silent hold was regularly used by ISAs for much the same reasons that Mr. Rabb had used it; (2) they were directed by coaches to use silent hold in this manner; and (3) no one other than Mr. Rabb had ever been disciplined for such use. Indeed, even one of Dish's own witnesses, an ISA, testified that, although "ISAs cannot place a customer on silent hold to use the restroom . . . he agreed . . . that he ha[d] routinely seen ISAs use silent hold and leave their workstations." R. at 840. Further, he admitted that he himself used BREAK AUX time beyond his

31

(authorized) allotment to use the restroom, and other ISAs admitted to using silent hold to use the restroom. *See id.*

Moreover, the ALJ found Mr. Rabb himself "highly credible" and "forthright, reliable, and consistent on direct and cross." R. at 841. Mr. Rabb had testified that his usage of silent hold was "commonplace," that his coaches told him to do so rather than use HOLD AUX, and that his coach was normally seated diagonally across from him and so was well aware of his conduct. R. at 840. These witnesses' testimony is more than substantial evidence for the Board's finding that use of silent hold like Mr. Rabb's was generally tolerated, further undermining Dish's claim that it would have fired Mr. Rabb even absent his protected activity.

If all of this were not enough, the Board also found lacking Dish's proferred comparator analysis. Specifically, the ALJ carefully summarized the comparator evidence that Dish offered of allegedly similar firings for "call avoidance," Pet'r's Opening Br. at 30, but effectively determined that the circumstances of those firings were not sufficiently similar to those of Mr. Rabb's to have explanatory power. In this regard, the termination notices that Dish offered often expressly state "call avoidance" as a cause and not uncommonly include evidence of varied and significant misconduct in addition to any avoidance. *See, e.g.*, R. at 841 (displaying the ALJ's "Summary of Discharge Events" based on Dish's evidence); *see also id.* at 631 (Ex. 5, Termination Notification for employee Brown, dated

32

Aug. 28, 2013) (noting eight instances of call avoidance and expressly denominating them as such); *id.* at 635 (Ex. 6, Termination Notification for employee Luckner, dated Dec. 6, 2012) (noting, along with "unnecessary hold/mute" and "[r]efusal to assist the customer and/or preventing receipt of inbound sales calls," "Willful Misinformation," "Creating false account," and "Entering false information into the system"). Mr. Rabb's termination notification, on the other hand, evinces only two instances of going to the bathroom while using silent hold, rather than using break time. *Id.* at 596 (GC Ex. 18, Termination Notification for employee Rabb, dated Mar. 7, 2014). Notably, Mr. Rabb's termination notice does *not* mention "call avoidance" at all, or the "rude[ness]," "attitude," or "insubordination" that Dish also claims supported its termination of Mr. Rabb. *Compare* Pet'r's Opening Br. at 31–33, *with* R. at 596.

Indeed, the ALJ expressly found that the kind of conduct for which Mr. Rabb was terminated was actually "akin" to an ISA exceeding his or her paid break allowance—which even Ms. Evans acknowledged was commonplace—and found that, regarding this type of misconduct, there was a "conspicuous lack of discipline" and that "while Dish has a rule prohibiting excessive silent hold usage, its enforcement of this rule is, at best, listless." R. at 841–42. To be sure, Dish argues that the ALJ should have accepted its account that Mr. Rabb's use of silent hold was no different than any other sort of "call avoidance" and so justified his termination. *See* Pet'r's Opening Br. at 30–33; Pet'r's Reply Br. at 25–27.

33

Comparing the various disciplinary reports and the ISA AUX usage statistics, various interpretations of the evidence may well be possible. But our task is merely to ascertain whether there is substantial evidence to support the Board's findings—notably, its finding that the comparators that Dish offered are not truly comparable. And we conclude that the Board's findings here are supported by substantial evidence.

Dish also asserts that the record does not establish that "relevant decision-makers had knowledge of other employees' *inappropriate* 'use of silent hold,' much less an opportunity to witness it unfolding before their eyes." Pet'r's Opening Br. at 33. But, as the ALJ pointed out and the record supports, Mr. Rabb credibly testified without rebuttal by Dish witnesses both that supervisors knew of his practice and that other Dish employees engaged in the same practice, and other ISAs credibly corroborated that testimony and stated that they themselves used silent hold to use the restroom. Based on these findings, the ALJ concluded that the coaches at the call center were aware of the practice and gave it their "tacit approval," which is further supported by the lack of analogous discipline solely for inappropriate use of silent hold. R. at 841. We cannot overturn this finding.

Lastly, Dish argues that the ALJ's—and, thus, the Board's—decision to "liken Rabb to employees who exceeded their Break AUX usage" improperly "supplant[ed] DISH's business judgment" with his own. Pet'r's Opening Br. at 33–36; Pet'r's Reply Br. at 27–28. However, Dish's authorities do not support its

34

contention that the Board proceeded in an improper manner.  In particular, the D.C. Circuit cases that Dish cites stand for the proposition that the Board may not interfere with a firing decision *where there is no unlawful motivation for the firing.  See, e.g.*, *Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 310–11 (D.C. Cir. 2006) (reversing Board finding of *Wright Line* prima facie case for lack of substantial evidence).  But there is no lack of substantial evidence for the Board's finding here that the General Counsel made out a prima facie case permitting an inference of unlawful motivation.  Furthermore, the General Counsel is correct in asserting in response to this argument that Dish's contentions amount to little more than an argument "that the Board was required to accept [Dish's] explanation for discharging Rabb without question."  Resp't's Br. at 40.  Of course, the Board was not.

Based on the foregoing, we conclude that there is substantial evidence supporting the Board's conclusion that Dish would not have fired Mr. Rabb in the absence of his protected activity.

## CONCLUSION

In sum, for the reasons discussed above, we **DENY** Dish's petition for review and **ENFORCE** the Board's order against Dish.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

35